UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

JA-ANN M. COLLINS,           )
                             )
        Plaintiff,           )
                             )
    v.                       )      CIVIL NO.  1:17cv380
                             )
NANCY A. BERRYHILL, Acting   )
Commissioner of Social Security, )
                             )
        Defendant.           )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) as provided for in the Social Security Act.  Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for DIB must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2013 (Ex. 5D).

2.      The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of April 5, 2013 through her date last insured of December 31, 2013 (Ex 3D, 4D, 5D, 7D)(20 CFR 404.1571 *et seq*.).

3.      Through the date last insured, the claimant had the following severe impairments: attention deficit disorder/attention deficit hyperactivity disorder, generalized anxiety disorder; affective disorders (variously characterized as bipolar disorder and major depressive disorder), borderline personality disorder, PTSD, and possible psychogenic dystonia (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she was unable to engage in complex or detailed tasks but she was able to perform simple, routine, repetitive tasks.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on April 19, 1973 and was 40 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from April 5, 2013, the amended alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

(Tr. 20-30).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on January 25, 2018. On February 26, 2018, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on March 22, 2018. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

Plaintiff filed an application for Disability Insurance benefits in August 2014. (Tr.

148-149). SSA denied the application in January 2015 finding that the evidence was insufficient to establish a disabling condition prior to December 31, 2013, the date Plaintiff was last insured for disability benefits. (Tr. 89-92, 165). Plaintiff timely filed a request for reconsideration which was denied in March 2015. (Tr. 95-98). In response to a timely-filed request, ALJ Steven McNeary held a hearing on May 25, 2016, and Plaintiff appeared and testified at the hearing along with her spouse, Heath Collins, and a vocational expert witness, Amy Kutschbach. (Tr. 37). Attorney Ann Trzynka appeared at the hearing and represented Plaintiff. (Tr. 37-71).

On August 3, 2016, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled as defined in the Social Security Act. (Tr. 15-36). Plaintiff asked SSA's Appeals Council to review the unfavorable decision. (Tr. 14). On June 28, 2017, the Appeals Council denied review. (Tr. 1-5). Thereafter, Plaintiff timely filed her complaint in this Court pursuant to 42 U.S.C. § 405(g).

Plaintiff was born on April 19, 1973, and was considered a "younger person" as of her alleged onset date. (Tr. 72). 20 C.F.R. § 404.1563(c). Plaintiff has at least a high school education and a history of performing semi-skilled work at the sedentary to medium exertional levels. (Tr. 67, 230). Plaintiff last worked in August 2008. (Tr. 40, 162). She was employed at that time as a detention officer for St. Joseph County Community Corrections and left that job when she moved to Fort Wayne to get married. (Tr. 40)

Plaintiff testified that she believed her disability started as of April 5, 2013, when she started having dystonic reactions. (Tr. 41, 163). At that time, Plaintiff was going to school and started to have dystonic reactions where she could not walk at times, her speech would be impaired, she would shake, her feet would "club in," and her hands would become locked or

would extend out and lock. (Tr. 42-43). She reported that she became very depressed and felt suicidal at times. (Tr. 43). Plaintiff testified that her symptoms persisted since 2013; they are not always present but were "pretty present now." (Tr. 42-43). She experienced dystonic reactions between three and ten times a day when on Lamictal and between five and twenty times per day after weaning off Lamictal. (Tr. 54-55). She estimated that the episodes normally last between five and twenty minutes, and she is sore and tender afterwards with weakness. (Tr. 53-55). The episodes feel like a "charlie horse" at first followed by a few seconds of a feeling like pins and needles. (Tr. 44). She has the most trouble when the reactions go into her feet, hands, and jaw. (Tr. 44). She is unable to stand or walk when experiencing an episode in the feet, and her hands are non-functional during an attack affecting her hands. (Tr. 45-46). The severity ranges from muscle twitching rated a two in pain to more severe episodes causing her to scream and cry. (Tr. 55). During the course of her hearing, Plaintiff reported that was experiencing a reaction in her foot and also had an episode with facial drooping. (Tr. 45-46, 59).

Plaintiff testified that she did "little things" around the house like dusting and spent much of her day on the sofa. (Tr. 46). She noted that it took her much longer to complete activities. (Tr. 47) She was able to drive, but only drove twice in the past year because she did not feel safe driving. (Tr. 47). She thought stress and climate affected her reactions. (Tr. 58). Plaintiff also testified concerning her return to school. (Tr. 50-52). She reported that after April 2013, she was given extra time to complete her schoolwork. The following semester she took two classes, and her professor gave her "extension after extension" to complete her work. (Tr. 51). She then started getting D's and F's and had to stop going to school. (Tr. 51).

Heath Collins, Plaintiff's husband, also testified at the hearing. (Tr. 37, 181). He had

observed the dystonic reactions since April 2013, and noted that some days were worse than others. (Tr. 69). He took Plaintiff to her appointments and felt it was not safe for her to drive, especially if she would have a reaction in her foot while driving. (Tr. 61-62). When he got home from work, Plaintiff would often be sitting on the couch because of the reactions and being "wiped out." (Tr. 63). Mr. Collins testified that Plaintiff's moods were "really bad," and he kept track of her medicine because she would forget to take it. (Tr. 63-64). He felt the medicines that had been tried were not working, and he was afraid to leave Plaintiff alone. (Tr. 64). He also noted that is very hard for Plaintiff to focus and stay with an activity. (Tr. 66).

In December 2014, state agency medical consultants with the Indiana Disability Determination Bureau (DDB), including a physician and psychologist, reviewed Plaintiff's claim at the initial level. (Tr. 72-78). Kari Kennedy, Psy.D., concluded that the evidence showed that the severity of a disabling condition could not be established prior to Plaintiff's date last insured. J.V. Corcoran, M.D., also concluded that the severity of a disabling condition could not be established prior to the date last insured. (Tr. 74, 91-93). Upon reconsideration, in March 2015, Indiana DDB psychologist, Joelle Larson, Ph.D., affirmed Dr. Kennedy's determination of insufficient evidence. (Tr.80-85). Joshua Eskonen, D.O., also affirmed the prior determination of Dr. Corcoran finding insufficient evidence. (*Id*.).

Plaintiff has a long history of mental health treatment and began receiving treatment at the Madison Center and Hospital beginning in May 1988. (Tr. 311-324). Services were initiated due to a history of molestation from ages 4 through 14. (*Id.*). In May 2001, Plaintiff underwent a psychiatric evaluation with Salvador Ceniceros, M.D., who diagnosed post-traumatic stress disorder and assigned a GAF (Global Assessment Functioning) score of 50. (Tr. 309-310).

Plaintiff participated in therapy and medication management in 2001 and 2002. (Tr. 289-310). In August 2002, Dr. Ceniceros noted that Plaintiff's mood swings had been quite dramatic, and he suspected bipolar II. (Tr. 308).

In April 2007, Plaintiff returned for services at the Madison Center and Hospital, and she was admitted from April 27-29, 2007, after taking 14 tablets of over the counter medication to sleep. She was diagnosed with depressive disorder, and a GAF score of 55 was assigned. (Tr. 287). In June 2007, Plaintiff was also diagnosed with ADHD (attention deficit hyperactivity disorder). (Tr. 284)

Plaintiff presented to psychiatrist, Jay Fawver, M.D. in July 2011 for an initial evaluation which was conducted over the course of 2-1/2 hours. (Tr. 504-509). Following the evaluation, Dr. Fawver diagnosed mental impairments, including bipolar disorder, generalized anxiety disorder, attention deficit hyperactivity disorder, and borderline personality disorder. (508-509). He prescribed Lamictal for bipolar disorder and migraine, Lorazepam for generalized anxiety disorder, and Adderall for attention deficit hyperactivity disorder. (*Id*.). At a follow-up visit in August 2011, post-traumatic stress disorder was added as a diagnosis. (Tr. 512). Plaintiff continued with regular visits to Dr. Fawver's office between July 2011 and August 2014. (Tr. 502-618).

Beginning on April 23, 2013, Plaintiff reported to Dr. Fawver that she was having dystonic clenching of her hands with bruising to the hand. (Tr. 571). Three bruised fingers were noted during the exam, and Plaintiff had a photo demonstrating clenching of the hands. (Tr.571-572). Her medication, Adderall XR, was stopped since her last visit on March 19, 2013, due to a dystonic reaction. (Tr.571). She noted that her mood was worsening because of her

8

physical problem, but not too bad otherwise. (*Id.*). At an urgent appointment on April 23, 2013, Plaintiff was upset because she felt a neurologist she saw was "judging" her and attributed the dystonia to her being bipolar. (Tr. 574).

In July 2013, Plaintiff had an urgent follow-up concerning lack of motivation/energy, untreated ADHD, and weight gain. (Tr. 581). With regard to her dystonia, she noted that it had not been too bad lately, but all of her joints hurt, and she had not been exercising a lot due to the dystonia and physical pain. (*Id.*). In August 2013, she reported that she was tired, getting daily panic attacks, and having low motivation. (Tr. 584). Dr. Fawver assessed intermittent bilateral dystonia "remitted." (Tr. 585).

In September 2013, Plaintiff reported her anxiety had improved, but she had returned to school and "could not read anything" and did not "have any concentration." (Tr. 588). In October 2013, she reported that she was getting Ds and Fs in school, and her mood was irritable because she could not focus. (Tr. 592). In December 2013, Plaintiff reported that her overall mood was "terrible" with irritability, and she was "unfocused." (Tr. 596). In January 2014, she reported her concentration was "terrible," and the medication Focalin was added. (Tr. 601-603).

By the end of January 2014, Plaintiff still had problems with focus. (Tr. 605). Her intermittent facial tics had improved on Focalin, but her tics were worse with stress, and she wanted a referral to another neurologist. (*Id.*). Plaintiff next returned in August 2014, and she reported that she had been having dystonia, didn't leave the house, and barely got off the couch. (Tr. 609). She felt like anti-depressants made her worse and perceived that her dystonia worsened after a second dose of the medication Sinemet in May 2014. (*Id.*). Dr. Fawver added

conversion disorder as a diagnosis, prescribed Klonopin, and suggested a low dose of the medication Brintellix. (Tr. 610-612). At a second appointment in August 2014, Plaintiff reported that it took a lot for her to leave the house and she did not care anymore. (Tr. 615).

In April 2013, Plaintiff presented to the Dupont Hospital emergency room with a headache on the right side, trouble coordinating eye movement, slurred speech, and facial numbness. (Tr. 328, 342-343). She had muscle fasciculations and a mild resting tremor. (*Id.*). Brain imaging was normal. (Tr. 333). Charles Kalsted, M.D., the attending physician, diagnosed dystonia and prescribed Benztropine. (Tr. 334-338).

On May 21, 2014, Plaintiff presented to the Dupont Hospital emergency room, and she was admitted from May 21-28, 2014. (Tr. 360-366, 378-379). Her presentation was "odd," her eyelids fluttered, and her mouth twitched. (Tr. 363). Plaintiff's symptoms were severe enough that she had very significant trouble walking, and the problem was exacerbated by change of position. (*Id.*). For the past several months, starting in July of 2013, Plaintiff experienced worsening episodes of dizziness and vertigo. (Tr. 375). The episodes were accompanied by debilitating episodes of severe dystonia in which she became extremely contracted in her upper and lower extremities to the point where her neck began to twist and turn in a torticollis fashion and with the lumbar spine presenting in a similar fashion. (*Id.*).

During her admission, Plaintiff had consultations with multiple specialists. On May 22, 2014, she had a consultation with cardiologist David Kaminskas, M.D. due to tachycardia. (Tr. 367). Dr. Kamiskas diagnosed autonomic dysfunction, possible orthostatic tachycardia syndrome, and dystonia of unclear etiology. (Tr. 368). Plaintiff also had a neurology consultation with Dilawer Abbas, M.D. His impression was dystonia, which he believed was psychogenic due

to findings on examination and a significant underlying psychogenic history with post-traumatic stress disorder associated with childhood molestation and history of mental abuse. (Tr. 373). Dr. Abbas explained that Plaintiff was not trying to fake her symptoms, but it is her subconscious mind reacting to previous childhood trauma. (Tr. 374).

On June 12, 2015, Plaintiff returned to Dupont Hospital due to dizziness and headache which was worsening over the past three days. (Tr. 1009). She also noted that three days earlier she had a dystonic reaction and fall, but she did not know if she had passed out. (*Id*.). She improved after administration of IV medication and was discharged home and instructed to follow-up with Fort Wayne Neurology and Neuropsychiatric Associates. (Tr. 1011-118).

On April 12, 2013, Plaintiff presented to neurologist, Fen Lei Chang, M.D., regarding involuntary movement and dystonic reactions, worse on the right. (Tr. 441-442). Dr. Chang reported that her presentation was likely intermittent dystonia with contribution to the symptoms from anxiety and stress. (Tr. 444-445). In May 2014, Plaintiff was seen in follow-up with Dr. Chang after a genetic evaluation, and Dr. Chang prescribed Sinemet for possible dopamine responsive dystonia. (Tr. 426). At a July 2014 visit, Dr. Chang recommended psychological treatment and psychotherapy because he thought the dystonia was psychogenic. (Tr. 422).

In May 2014 Plaintiff presented to Patricia Bader, M.D. at Northeast Indiana Genetic Counseling Center for an evaluation of her dystonia after being referred by her primary care physician, Dr. Schlie. (Tr. 358). During the exam, Dr. Bader observed an episode of dystonia with left hand contracture and hard muscles during the dystonic reaction. (Tr. 358-359).

In October 2013, Plaintiff established care with Sarah Schlie, D.O., a primary care physician. (Tr. 491-495). Plaintiff had regular visits with Dr. Schlie between October 2013

and May 2016. (Tr. 451-500, 660-723, 1032-1054). Dr. Schlie evaluated Plaintiff's physical and mental conditions, including dystonia/involuntary movements, hypothyroidism, abdominal pain, headaches, fatigue, anxiety, and depression. (*Id*.).

In April 2014, Plaintiff presented for an appointment with Dr. Schlie and advised her that she was having problems with dystonia since stopping Lamictal (Tr. 469). Dr. Schlie prescribed Gabapentin and referred Plaintiff for evaluations with a neurologist and Dr. Bader, geneticist. (Tr. 474). In May 2014, Plaintiff reported that Gabapentin was helping her mood and her involuntary movements slightly. (Tr. 466-469). In July 2014, Plaintiff presented for a recheck of the dystonia and medication refills and noted that she was worsening. (Tr. 451). Dr. Schlie recommended a referral to a neurologist at IU, Cleveland, or whoever her insurance would allow, as well as a cardiologist referral. (Tr. 454). Dr. Schlie noted a suicide action plan was in place. (*Id*.). In October 2014, Plaintiff asked for a referral to another psychiatrist and for a refill of her psychiatric medications. (Tr. 719-723). Plaintiff was seen in December 2014, for abdominal pain. (Tr. 689-718).

In January 2015, Plaintiff presented to discuss medical issues, including her dystonia and anxiety (Tr. 682-687). In April 2015, Plaintiff reported worsening headaches and insomnia, and Dr. Schlie prescribed Amitriptyline. (Tr. 673). At a May 2015 visit, Dr. Schlie observed a dystonic episode where Plaintiff had a spastic and rigid left upper extremity that extended to the elbow. (Tr. 660-664). Dr. Schlie prescribed Baclofen and referred Plaintiff to the Cleveland Clinic. (Tr. 664).

In June 2015, Dr. Schlie prescribed Meclizine for problems with balance and vertigo and reported the dystonia was stable with continued flare-ups. (Tr. 933). In March 2016, Plaintiff

reported to Dr. Schlie that she was light-headed, shaky, and felt "horrible". (Tr. 863). In May 2016, Plaintiff returned to Dr. Schlie following her visit to the Cleveland Clinic, and she reported that the neurologist believed she had dystonia but that it was not neurologic in nature. (Tr. 1048).

On May 24, 2016, Dr. Schlie completed a medical source statement describing Plaintiff's medical impairments and functional abilities. (Tr. 1052-1054). She reported that Plaintiff experienced a loss of function, inability to maintain sustained physical activity, lack of concentration, weakness and muscle fatigue, and she provided a medical opinion concerning her condition and limitations as of April 4, 2013. (Tr. 1054).

On December 18, 2014, Plaintiff presented to neurologist, Ryan Overman, M.D., at IUH Methodist Hospital for a second opinion regarding her dystonic reactions. (Tr. 937). Although the consultation occurred just shy of one year after the date last insured, the consultation notes provide historical information about Plaintiff's condition and symptoms prior to the date last insured. (Tr. 937-940). The notes indicate that Plaintiff was having problems in April 2013 with her eyes closing involuntarily, a sharp pain in the back of the head, and twitching in the right lip that evolved into twitching of the right eye with numbness and tingling in the right arm. (Tr. 937-938). Thereafter, she began having dystonic reactions, occurring daily or only a couple of times per week. (*Id*.). She described involuntary muscle contractions preceded by light-headedness, slurred speech, motor arrest and involuntary muscle cramps in random places of the body with a twisting sensation. (*Id*.). She occasionally noticed inversion of the feet, gait imbalance, confusion, and memory loss. (*Id*.). Dr. Overman indicated that Plaintiff may have a serotonin deficiency that could be affecting her mood, concentration, energy level, sleep, appetite,

and a wide variety of somatic complaints for which there is no clear medical explanation. (Tr. 939). He prescribed Sertraline, titrated up to a dose of 50 mg. daily. (*Id.*).

On July 2, 2015, Plaintiff presented to John Collins, MD regarding muscle spasms, tingling, vertigo, and grasping things. She again noted an onset of symptoms in April 2013. She noted a decrease in dystonia activity after her psychiatrist, Dr. Fawver, decreased Lamictal; however, she still continued to have a significant amount of symptoms. (Tr. 944). Dr. Collins noted a strongly positive Romberg with tendency to fall backwards associated with vertigo when her eyes were closed. (Tr. 945). At a follow-up visit with Dr. Collins in August 2015, Plaintiff reported periodic spasms involving the right side of the body starting in the right hand with daily events that can last for several hours. (Tr. 1029). Dr. Collins prescribed Tizanidine, Medrol Dosepack, and Baclofen. (Tr. 1031).

In April 2016, Plaintiff presented to Kristin Appleby, MD at the Cleveland Clinic for an evaluation regarding her dystonia. (Tr. 987). Plaintiff reported that her current symptoms started in 2013 and that she has "never felt well" since 2008. (Tr. 987). Dr. Appleby observed the dystonic reactions involving the right hand and forearm, the left foot, and right lower extremity. (Tr. 991). Dr. Appleby reported that the dystonia could be paroxysmal kinesiogenic from antipsychotic use or non-physiologic psychogenic spells. (Tr. 991-992).

In support of remand, Plaintiff first argues that the ALJ improperly weighed the opinion from treating physician, Dr. Sara Schlie. "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [a claimant's] symptoms, diagnosis and prognosis…" 20 C.F.R. § 404.1527(a)(1). A treating physician's opinion regarding the nature and

14

severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870; 20 C.F.R. § 404.1527(c)(2) .

In the present case, Plaintiff contends that the ALJ failed to properly evaluate and weigh the medical opinions of treating physician Dr. Schlie and impermissibly substituted his own judgment for her opinions without relying on other medical evidence or authority in the record. *See Clifford*, 227 F.3d at 870.

In May 2016, Dr. Schlie completed a medical source statement concerning Plaintiff's impairments and functional abilities. (Tr. 1052-1054). Dr. Schlie reported that the limitations applied as of April 2013. (Tr. 1054). She indicated that Plaintiff had paroxysmal kineiogenic dyskinesia along with other diagnoses including, dystonia, fatigue, anxiety, headaches, and pain. (Tr. 1052). Dr. Schlie estimated that in a competitive work situation that Plaintiff would require hourly breaks of 15 to 20 minutes, could lift less than ten pounds occasionally and rarely lift ten pounds, and could sit for less than two hours and stand/walk less than two hours in an eight-hour workday. (Tr. 1052-1053). Dr. Schlie reported that Plaintiff was incapable of "low stress" work, would likely be off task 25% or more of a workday, and would likely be absent from work four or more days per month as a result of her impairments or treatment. (Tr. 1053-1054). These limitations would result in a step five finding of disability. (Tr. 69). *See* Social Security Ruling (SSR) 96-9p.

Despite the evidence supporting Dr. Schlie's opinions, including updated medical

15

evidence from the Cleveland Clinic, the ALJ assigned "little weight" to the opinions concerning Plaintiff's diagnoses and functioning. (Tr. 24-25) The ALJ claimed that there was "nothing in the record to support a finding that the claimant had any severe physical impairment, including dystonia." (Tr. 24). Yet, he found that "possible psychogenic dystonia," was a severe impairment, which seemingly reflects his uncertainty and lack of understanding regarding Plaintiff's medical conditions.

Dr. Schlie was in essence the only physician who provided a medical opinion regarding Plaintiff's impairments and functioning. The review by the state agency medical consultants consisted of a cursory finding of "insufficient evidence." (Tr. 75-76, 83-85). The ALJ acknowledged a routine practice by the state agency of denying cases on the basis of insufficient evidence when a claim is filed after the date last insured: "I think you file an application after your date last insured, they rule there's insufficient evidence…..They will not give you the medical opinion that are you entitled to—or your claimant is." (Tr. 70). But, instead of obtaining a medical opinion as requested by Plaintiff's counsel at the hearing, the ALJ rejected Dr. Schlie's opinion regarding the diagnoses and impermissibly made his own assessment regarding Plaintiff's complex medical conditions. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

As to the reasons for rejecting Dr. Schlie's opinion, the ALJ offered the following: (1) the claimant's "largely normal presentation to various treating and examining physicians of record; (2) the lack of inpatient psychiatric hospitalization; and (3) her "at least somewhat full activities," including getting all A's in her college classes, doing some driving and shopping, paying bills and handling a bank account. (Tr. 28).

Plaintiff contends that the ALJ's characterization of the physical exams as "largely

normal" does not account for important medical evidence from treating physicians and a psychiatrist. In particular, the ALJ depreciated the extent of the abnormal symptoms within the psychiatric treatment records of Dr. Fawver. (Tr. 504-618). This is particularly problematic because at least two neurologists as well as Dr. Fawver attributed the dystonia, at least in part, to psychological causes. (Tr. 374, 422, 610-612). These records reflect fluctuating mood and concentration during the relevant period. Dr. Fawver's office visit note of August 21, 2014, also contains a lengthy list of psychiatric medications that were tried, but ineffective, or caused intolerable side effects. (Tr. 616).

With regard to the physical exams being "largely normal," the dystonia did not occur constantly and would not necessarily be observed at every, or even, most examinations. The term "paroxysmal" indicates that the symptoms are noticeable only at certain times. However, there is ample evidence of observation of the dystonia both before and after the date last insured in the medical and non-medical evidence. For example, the dystonia was observed at Dupont Hospital in April 2013. (Tr. 328). Dr. Fawver's exam in April 2013 showed bruising on three fingers on Plaintiff's right hand and observation of photos demonstrating clenching of the hands with reported inability to stop. (Tr. 571-572). Records following the date insured reflect ongoing evaluations and treatment regarding the dystonia with observation of the episodes by Dr. Schlie, Dr. Appleby, and Dr. Bader. (Tr. 359, 660-664, 991). Additionally, Plaintiff, her husband, Heath Collins, and her daughter, Brittany Aters, all provided information and a description of the dystonic events during the relevant timeframe. (Tr. 43-46, 53-56, 60-63, 186-187, 237).

With regard to the "lack of inpatient psychiatric hospitalization," the ALJ has not explained why this undermines Dr. Schlie's opinions. Dr. Schlie has not opined that Plaintiff's

impairments require her to be locked up in a mental institution. Clearly, the ALJ failed to understand the complexity of Plaintiff's mental illness which does not necessarily require inpatient psychiatric care. *See Voight v. Colvin* 781 F.3d 871, 876 (7th Cir. 2015) ("[I]institutionalization of the mentally ill is generally reserved for persons who are suicidal, violent, demented or (for whatever reasons) incapable of taking even elementary care of themselves."). A lack of inpatient psychiatric hospitalization during the relevant period does not undermine Dr. Schlie's opinion or demonstrate that Plaintiff was capable of gainful activity. *Voight* 781 F.3d at 876.

The ALJ also overstates Plaintiff's "somewhat full activities" and does not explain why the activities undermine Dr. Schlie's opinion. (Tr.24-25). With regard to activities such as driving and shopping, paying bills and handling a bank account, Plaintiff testified that she had driven twice in the past year and a half. Her husband, Heath Collins, reported that he drove and did not feel it was safe to have his wife drive. (Tr. 47, 61-62, 182). Mr. Collins did the cooking and made sure his wife took her medication. (Tr. 64, 183). Both Mr. Collins and Plaintiff reported that Plaintiff did not pay the bills. (Tr. 184). Plaintiff indicated that she rarely shopped in stores and shopped online once or twice a month. (Tr.192). Clearly, these minimal activities are not inconsistent with Dr. Schlie's opinions. The ALJ committed a common legal error by failing to recognize that "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . . . The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Gentle v. Barnhart*, 430 F.3d 865, 867-68

(7th Cir. 2005).

With respect to her schooling, the evidence shows that Plaintiff returned to school at Ivy Tech the fall semester of 2012. (Tr. 240-241). She obtained A's in her classes in 2012 and 2013, taking two to three classes at a time for between six and nine credit hours. She testified that in April 2013, her English instructor gave her extra time to complete her assignments. (Tr. 51, 241). The following semester her history professor—who was the same professor for the two classes she was taking—gave her "extension after extension" of time. (*Id.*). She could not even finish two weeks when she returned to school for the spring 2014 semester because she was not able to type, was having a hard time sitting in class, and having dystonic reactions in the classes. (Tr. 51-52, 241). The transcript from Ivy Tech reflects that Plaintiff failed and withdrew from three classes in the spring of 2014 and two classes in the fall of 2014. (Tr. 241-242).

Even if the ALJ did not afford controlling weight to Dr. Schlie's opinions, the ALJ was required to consider the factors set forth in 20 C.F.R. § 404.1527(c) for weighing Dr. Schlie's medical opinion. The ALJ's evaluation of the opinion evidence fails to reflect consideration of the factors described in 20 C.F.R. §404.1527(c)(2)(i), (c)(2)(ii), and (c)(3) through (c)(6) that are used for weighing opinion evidence. The ALJ must consider the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). These factors support Dr. Schlie's opinions. Dr. Schlie regularly evaluated and treated Plaintiff since October 2013. (Tr. 1052). Although Dr. Schlie is not a psychiatrist or neurologist, Dr. Schlie coordinated consultations with specialists, including geneticist, Dr. Bader, and neurologists, Dr. Overman and Dr. Appleby. (Tr. 358, 937, 992). She

has also treated Plaintiff for the dystonia and her psychiatric conditions. (Tr. 454, 466-469, 474, 664, 682-687, 719-723). Clearly, the record reflects that the ALJ failed to evaluate these factors and give them appropriate weight. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

To the extent the ALJ arguably relied on medical opinion from the state agency, a contradictory opinion of a non-examining physician does not, by itself, suffice to reject an examining physician's opinion. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ's rejection of the treating source medical opinion is especially problematic in this case because the ALJ acknowledged that the record essentially lacked an opinion from the state agency medical consultants. (Tr. 69-70).

The Commissioner has failed to respond to Plaintiff's argument that Dr. Schlie was the only physician who provided medical opinions regarding Plaintiff's impairments and functioning. The Commissioner also does not defend and apparently concedes the corollary point, that the record lacked a proper state agency medical consultant review. Consequently, the ALJ relied on no medical expert opinion to support his decision and findings, including his rejection of the opinion from Plaintiff's treating physician.

The Commissioner defends the ALJ's rejection of the opinions of Dr. Schlie because the ALJ allegedly considered medical evidence inconsistent with the opinions. However, the Commissioner does not explain how the evidence is inconsistent with Dr. Schlie's opinions. The Commissioner also claims that Plaintiff's argument is flawed due to citation to evidence following the date last insured, but the Commissioner's argument on this point is inconsistent with SSA's own internal policy guidance. SSA Policy Operation Manual Systems (POMS) instructs adjudicators regarding the necessity in some instances of considering medical evidence

after the date last insured. *See* POMS 25501.3202 ("You must always establish that severity of the impairment(s) is expected to last for 12 months from the onset date (the duration requirement), even if the DLI is in the past. That is, you may need to request medical evidence of record after the DLI is expired.").

Plaintiff has cited to evidence before and after the date last insured which reflects the continuation and ongoing severity of Plaintiff's impairments for at least the requisite twelve-month period. Moreover, even if Plaintiff's condition worsened after her date last insured, that does not mean that it did not reach a disabling level prior to that date. The onset of Plaintiff's impairments, particularly her dystonia, coincides with her April 2013 alleged onset date and visit to the Dupont Hospital emergency room where she was diagnosed with dystonia. (Tr. 328, 342-343). This is well before her December 31, 2013 date last insured. The testimony from the witnesses also corroborated the severity of the symptoms during the period when Plaintiff was insured for benefits, yet the Commissioner does not respond regarding this point. The Commissioner has likewise failed to address the ALJ's incomplete and faulty citation to Plaintiff's "somewhat full activities" as undermining Dr. Schlie's opinions. As noted above, these activities are consistent with and do not undermine Dr. Schlie's opinions.

With regard to the ALJ's assessment of the severity of Plaintiff's impairments, the Commissioner misunderstands Plaintiff's argument. Plaintiff's point is that the ALJ's step two analysis characterizing a severe impairment as a "possible" condition reflects his lack of medical expertise to evaluate Plaintiff's complex medical impairments. Despite the ALJ's lack of medical qualifications, he rejected the only medical opinion in the record and in so doing impermissibly used his own lay intuition to interpret the medical evidence and findings. *Moon v. Colvin*, 763

F.3d 718, 722 (7th Cir. 2014) ("….ALJ's are requested to rely on expert opinions instead of determining the significance of particular medical findings themselves."). Because the ALJ did not afford Dr. Schlie's opinions controlling weight, he was then required to evaluate the opinions against the factors in 20 C.F.R. § 404.1527(c). As the ALJ failed to do the required evaluation, remand is necessary.

Next, Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's mental impairments and failed to incorporate, in the hypothetical, his finding of a moderate degree of limitation in concentration, persistence or pace. In his special technique, the ALJ found that Plaintiff had moderate difficulty in concentration, persistence or pace. (Tr. 24). In the hypothetical posed to the VE, the ALJ found that Plaintiff was unable to engage in "complex or detailed tasks" but she was able to perform "simple, routine, and repetitive tasks." (Tr. 26, 67-69).

When an ALJ poses a hypothetical question to a VE, the question must include all limitations supported by the medical evidence in the record, which includes deficiencies of concentration, persistence and pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003). The Seventh Circuit cases taken together suggest that the most effective way to ensure that the VE is fully aware of the claimant's limitations is to include all of them directly in a hypothetical. *O'Connor-Spinner*, 627 F.3d at 619. In most cases, employing terms like "simple repetitive tasks" or "unskilled work" on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace. *Id.* at 620.

Although there may be instances where a lapse on the part of the ALJ in framing the

hypothetical will not result in remand, for most cases the ALJ should expressly refer to limitations on concentration, persistence and pace in the hypothetical to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs the claimant can do. *Id*. None of the exceptions are applicable in this case. The first exception applies where the VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *O'Connor-Spinner*, 627 F.3d at 619. In the present case, there is no evidence that the VE independently reviewed the record. The VE testified that she did not consider any limitations beyond those the ALJ included in his hypotheticals. The ALJ also gave a second hypothetical and asked the VE to consider limitations consistent with testimony. (Tr. 67-68). The VE replied that there would not be significant number of jobs that the claimant could perform because she would likely be "off task" in excess of 20 percent of the day. (Tr. 68). Clearly, the VE's responses confirm the harmful nature of the ALJ's error in failing to properly account for Plaintiff's deficits with concentration, persistence and pace by providing only a limitation to simple, routine, repetitive tasks.

The ALJ's mental RFC for simple, routine, and repetitive tasks is equivalent to a limitation for unskilled work and fails to link Plaintiff's concentration, persistence, and pace difficulties to her condition. (Tr. 74). The testimony, the medical evidence, and medical opinion from Dr. Schlie reflect that Plaintiff's impairments resulted in difficulties with concentration, persistence and pace and would render her "off-task." The ALJ has failed to account for this in the hypothetical. Consequently, there is no assurance to this Court that the VE's testimony constitutes substantial evidence of the jobs Plaintiff can perform. *Id*. at 620.

In response, the Commissioner has not explained how the ALJ's hypothetical for "simple and routine tasks" accounts for Plaintiff's moderate limitations with concentration, persistence or pace. The Seventh Circuit very recently rejected a similar argument made by the Commissioner and indicated that limitations to "simple" and "routine" work do not account for moderate limitations in concentration, persistence or pace. *See Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018). The Commissioner seems to contend that this case meets an exception which would excuse the ALJ's defective hypothetical. However, as explained above, no exception applies in this case.

The Commissioner claims that the hypothetical is sufficient because the ALJ's RFC is more restrictive than the state agency psychologist and that the ALJ considered all the evidence in formulating the RFC. However, this does not excuse the ALJ's failure to account for the moderate limitations in concentration, persistence or pace that he found. The record as a whole reflects that Plaintiff is limited with sustaining and maintaining concentration, persistence and pace to perform work activities throughout a work-day, regardless of the complexity of the tasks. As a result, the vocational expert's assessment of the jobs that Plaintiff could perform is called into doubt, as is the ALJ's conclusion that Plaintiff is not disabled under the Social Security Act. Thus, remand is warranted.

Next, Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's symptom testimony and consider her impairments in combination. To enable the Court to properly evaluate the legal and factual support for the Commissioner's decision, the ALJ must articulate a legitimate (even if minimal) justification for the decision. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). While an ALJ is not required to mention every piece of evidence, "he must at

least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). The written decision must "build an accurate and logical bridge from the evidence to [the] conclusion." *Id*.

In the present case, the ALJ found the testimony concerning the intensity, persistence, and limiting effects of Plaintiff's impairments was not "entirely consistent with the medical evidence and other evidence in the records." (Tr. 24, 27). He offered the following reasons: (1) Plaintiff stopped working in 2008 because she relocated to get married, not because of her impairments; (2) Plaintiff filed for disability benefits almost a year and a half after she alleged her disability began; (3) Plaintiff was able to engage in a somewhat full range of activities during the period at issue; (4) Plaintiff attended college classes through 2013 earning all A's; (5) Plaintiff had not been hospitalized for psychiatric reasons during the period at issue; and (6) Plaintiff had a "largely normal presentation to various treating and examining medical sources. (Tr. 27-28).

With regard to the first reason for rejecting the symptom testimony, Plaintiff testified that she felt she became unable to work as of April 2013 due to her condition. (Tr. 41). There is no inconsistency in her stopping work in 2008 for reasons unrelated to her condition. As to the second reason, the ALJ never asked Plaintiff why she did not file her application for disability earlier. There are many potential reasons for waiting to file, including, *e.g*., expecting that a medical condition will improve with treatment, being unaware of the possible entitlement to benefits, lack of understanding the steps to apply, or a perhaps a reluctance to admit disability. *See Sarchet* 78 F.3d at 308. ("Many people are ignorant of the full range of available benefits, or reluctant to undergo arduous administrative proceedings in which they are called liars, until desperation resulting from a personal crisis…..."). Further, Plaintiff returned to school, albeit

on a part-time basis and had career goals until her medical condition deteriorated in 2013, after which time it became apparent that she could not even handle a part-time school schedule. (Tr. 50-52, 239-242). The Court has addressed reasons three through five above, in the discussion of the ALJ's rejection of Dr. Schlie's medical opinions.

Plaintiff further contends that, in evaluating Plaintiff's subjective complaints, the ALJ failed to give adequate consideration to the cumulative effects of Plaintiff's impairments, including the complex interplay between Plaintiff's mental impairments and her physical functioning, in evaluating her credibility and in assessing her RFC. *Parker*, 597 F.3d at 922 (7th Cir. 2010).

In response, The Commissioner argues that the ALJ's credibility determination is not "patently wrong" and should not be overturned and that the ALJ properly evaluated Plaintiff's "credibility" and symptom testimony consistent with the regulations and SSR 96-7p. However, the Seventh Circuit has clarified that the "patently wrong" standard as it applies to the evaluation of symptoms means that the decision lacks explanation or support. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). It follows that a credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence. *Id.* In this case, the evaluation of Plaintiff's symptoms is not logically based on the findings and the evidence. At the time the ALJ issued his decision, the Commissioner had already rescinded SSR 96-7p and replaced it with SSR 16-3p which eliminates the term "credibility" and clarifies SSA's policy for evaluated symptoms. Many of the factors described in SSR 16-3p require the adjudicator to understand the underlying medical evidence.

Clearly, the ALJ lacked the expertise to evaluate Plaintiff's medical impairments and

consequently his evaluation of the symptom testimony is not supported by the evidence and also relies on interferences that are not logically based on the evidence and connected to Plaintiff's impairments. Therefore, the ALJ's evaluation of Plaintiff's symptom testimony is not entitled to deference due to the serious errors in failing to logically connect the reasons for the assessment to the conclusions. *Cullina*n, 878 F.3d at 603. Thus, remand is necessary on this point also.

Lastly, Plaintiff argues that the ALJ's step three finding with regard to impairment listings is not supported by substantial evidence. Plaintiff contends that the ALJ failed to properly consider and evaluate whether Plaintiff's physical and mental impairments met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Although there is no listing for dystonia, Plaintiff's counsel argued to the Appeals Council that this impairment should have been considered for medical equivalence to a listing. (Tr. 243-245, 249-252). *See* Program Operations Manual System (POMS) DI 25220.010 (Meet or Medical Equals). In particular counsel argued that Listing 11.03 (Epilepsy, non-convulsion), as in effect at the time of the ALJ decision, should have been considered. In addition, Listing 11.06 (Parkinsonian syndrome) which requires significant rigidity, bradykinesia, or tremor in two extremities, which, singly or in combination, result in sustained disturbance of gross and dexterous movements, or gait and station is another closely analogous listing that the ALJ should have considered. (Tr. 244, 249-253).

However, the ALJ did not even mention the neurological impairment listings in his decision. (Tr. 23-24, 80). Although the ALJ addressed several mental impairment listings, the record lacked reliable state agency review to support the ALJ's step three finding. In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the

listing by name and offer more than perfunctory analysis of the listing. The failure to provide

meaningful analysis of the listings, let alone mention several pertinent listings, does not allow for

meaningful judicial review of the ALJ's opinion and necessitates remand. *See Minnick v. Colvin*,

775 F.3d 929, 935-36 (7th Cir. 2015); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004);

*Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012); *Brindisi v. Barnhart*, 315 F.3d 783, 786

(7th Cir. 2003).

 In response, the Commissioner concedes that the ALJ did not mention these listings

but claims that the ALJ otherwise sufficiently developed and articulated a rationale regarding

his evaluation and "spent several pages of the decision" discussing issues relevant to the listing.

However, the Commissioner mentions only the ALJ's recitation of mental impairment listings

and evidence related to those listings. The Commissioner has failed point to any discussion of the

factors related to Listing 11.03 or 11.06. For example, Listing 11.03, as in effect at the time of

adjudication, required phenomena with alteration of awareness and transient postictal

manifestation of unconventional behavior or significant interference with activity during the day,

occurring more frequently than once weekly. Listing 11.06 required significant rigidity,

bradykinesia, or tremor in two extremities, which, singly or in combination, result in sustained

disturbance of gross and dexterous movements, or gait and station. The Commissioner has not

demonstrated that the ALJ minimally articulated a rationale relative to Listings 11.03 and 11.06.

Since there is no specific listing for claimant's dystonia, an evaluation of medical equivalence is

necessary.

 The Commissioner has apparently conceded that there is no sufficient state agency

medical consultant evaluation with regard to these listings. Given that a determination of medical

equivalence requires a medical expert opinion, it is obvious that this issue was never properly considered.  *See* SSR 96-6p.  Therefore, remand is required on this point also.

Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Opinion.


 Entered: April 27, 2018.

s/ William C.  Lee
William C. Lee, Judge
United States District Court